UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/19/2022
```

MAUREEN M. BILLINGS,

                    Plaintiff,

     -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, ROGER A. MURPHY, PAUL J.
ARTUZ, and DIANE CURRA

                    Defendants.

19-cv-11796 (NSR)

ORDER & OPINION

NELSON S. ROMÁN, United States District Judge:

Plaintiff Maureen M. Billings ("Plaintiff") brings this action for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the First and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 ("Section 1983"), the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), and N.Y. Executive Law § 296. Plaintiff previously raised these claims in her Amended Complaint, which was dismissed without prejudice on September 10, 2021. Plaintiff has amended each of her claims and continues to assert them against the New York State Department of Corrections and Community Supervision ("DOCCS"), Deputy Superintendent for Security Roger A. Murphy, Captain Paul J. Artuz, and Lieutenant Diane Curra, alleging that they discriminated and retaliated against her as a Muslim woman suffering from diabetes and stress-related impairments.

Now before the Court is Defendants' motion to dismiss the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 46.) For the following reasons, the motion is GRANTED, and Plaintiff's claims are dismissed with prejudice.

1

## BACKGROUND

The following facts are taken from Plaintiff's Second Amended Complaint (ECF No. 40) and are accepted as true for purposes of this motion.

Plaintiff is a practicing Muslim woman who, in compliance with her faith, wears a hijab in public. (Second Am. Compl. ¶ 17.)  Plaintiff also has diabetes.  (*Id*. ¶ 10.)  Plaintiff is employed as a Corrections Officer with the New York State Department of Corrections at the Bedford Hills Correctional Facility.  (*Id*. ¶ 18.)  On October 14, 2016, Plaintiff submitted a letter to the Diversity Management Office requesting permission to wear a hijab at work.  (*Id*. ¶ 19.)  In a letter dated April 16, 2016, Plaintiff was granted her accommodation request to wear a hijab, subject to certain conditions outlined in that letter, including that (1) the hijab must be tucked under her uniform shirt, (2) the hijab must be no larger than three feet by three feet, and (3) it must be worn in a way that it would immediately tear away should anyone try to grab it.  (*Id*. ¶ 22.)

The letter stated that prior to letting her wear a hijab, the Deputy Superintendent of Security (Defendant Murphy) had to confirm that Plaintiff's hijab met these approved specifications.  (*Id*.) The Diversity Management Office stated that a supervisor would meet with Plaintiff to have her demonstrate that the hijab met the requirements laid out in her approval letter.  (*Id*. ¶ 23.)  The Diversity Management Office also stated that if she indicated she could not remove the hijab in front of other people, she would be provided with a private area to remove it, or told to leave and come back with it available for inspection.  (*Id*.)

On May 1, 2017, Plaintiff was ordered to report to Defendant Murphy's office.  (*Id*. ¶ 26.) Plaintiff was accompanied by a female union representative.  (*Id*. ¶ 27.)  Defendant Murphy reprimanded Plaintiff for wearing her hijab at work without first consulting him, and instructed her to tuck it into her shirt (as per the approved specifications).  (*Id*. ¶ 28.)  Plaintiff explained she

did not consult with him or any other supervisors because there were no high-ranking supervisors on duty over the weekend, and that it would have been violative of her religious beliefs to not wear her hijab to work.  (*Id*. ¶ 29.)

On May 2, 2017, Plaintiff was ordered to report to Defendant Artuz's office, again accompanied by a female union representative.  (*Id*. ¶¶ 31–32.)  Defendant Artuz stated her hijab needed to be three feet by three feet in size.  (*Id*. ¶ 38.)  Plaintiff asked for the directive that stated this rule, and Defendant Artuz responded that she could "like it or take it off."  (*Id*. ¶ 39.)  Plaintiff and the union representative then cut down the hijab outside of Defendant Artuz's presence.  (*Id*. ¶ 40.)

Defendant Artuz then stated that Plaintiff had three options if she wanted to wear the hijab in the prison: (1) take the hijab off and go to work, (2) keep the hijab on, go home and "deal with the consequences," or (3) demonstrate that the hijab could be pulled off quickly without choking her.  (*Id*. ¶ 43.)  Plaintiff stated she could perform the demonstration in front of a female supervisor, as her religion prohibits her from disrobing in front of men outside of her immediate family.  (*Id*. ¶ 45.)  Defendant Artuz insisted Plaintiff remove her hijab in front of him as there were no female supervisors available.  (*Id*. ¶ 46.)  Plaintiff then removed her hijab in front of Defendant Artuz.  (*Id*.  ¶ 49.)  There were two female supervisors on duty at that time.  (*Id*. ¶ 47.)

After this meeting, Plaintiff felt faint and experienced disorientation, poor balance, and weakness in her limbs.  (*Id*. ¶ 52.)  While walking back to her post, Plaintiff had an anxiety attack and her knee "buckled" twice, causing her to fall.  (*Id*. ¶¶ 55–56.).  A sergeant nearby observed the fall, told Plaintiff she was not fit for duty, and sent her to the medical clinic where she was instructed to fill out Workman's Compensation papers and was sent home.  (*Id*. ¶¶ 56–57.)  On her way out of the facility, Officer Valerie Calhoun informed Plaintiff that Defendant Murphy and/or

Defendant Artuz directed all employees to write a memorandum if they interacted with Plaintiff. (*Id*. ¶ 58.)

Plaintiff was seen by her doctor, who diagnosed her with having experienced an anxiety attack brought by emotional stress, all of which were in connection with her diabetes.  (*Id*. ¶ 61.) Sometime thereafter, Plaintiff returned to work with a doctor's note that cleared her to return to duty.  (*Id*. ¶ 62.)  Plaintiff presented the note to Defendant Curra, who stated that stress is a mental illness not covered under Workman's Compensation.  (*Id*. ¶ 65.)  Plaintiff was then instructed to complete "mental illness forms" prior to returning to work.  (*Id*. ¶ 66.)  She subsequently completed the forms, but they were denied for having the wrong date.  (*Id*.)  Plaintiff re-submitted the forms on four subsequent occasions, each of which were rejected due to a mistake that Plaintiff made on those forms.  (*Id*. ¶ 67.)

Plaintiff submitted "medical documentation receipts" from May through August.  (*Id*. ¶ 69.)  While Defendant Curra certified that the medical documentation receipts conformed to DOCCS standards, at some point later, Defendant Curra retroactively marked the medical documentation receipts as non-conforming.  (*Id*. ¶ 67.)

On June 27, 2017, Plaintiff received a letter stating that she was being removed from the payroll as of May 27, 2017, despite not having been issued any disciplinary sanctions.  (*Id*. ¶ 72.) Plaintiff's doctor signed a Workman's Compensation document on July 21, 2017, stating that Plaintiff was neurologically cleared, not depressed, and had no emotional issues preventing her from returning to work on August 1, 2017.  (*Id*. ¶ 70.)  Defendant Curra rejected the doctor's notes. (*Id*. ¶ 71.)  Shortly after, on or about August 4, 2017, Plaintiff was informed that she had been overpaid $13,598.04 for the time-period of May 16, 2017 through July 19, 2017, and Plaintiff

promptly repaid over $1,000.  (*Id.* ¶¶ 73, 75.).  Plaintiff applied for unemployment, but that application was denied by Defendant Curra.  (*Id.* ¶ 78–79.)

Defendant Curra directed Plaintiff to receive a medical examination scheduled on or about September 27, 2017. (*Id.* ¶ 80.)  When she arrived at the appointment, Plaintiff was told that that it was a psychological examination to be conducted by Dr. Kurtz, who upon Plaintiff's information and belief, was a personal associate of Defendant Curra.  (*Id.* ¶¶ 83–84.)  Shortly after the exam began, Dr. Kurtz received a call on his cellphone from Defendant Curra, who asked whether Plaintiff showed up to the appointment.  (*Id.* ¶ 86.)  Dr. Kurtz recorded the examination and refused to provide Plaintiff a copy of the recording upon her request.  (*Id.* ¶ 87.)

Plaintiff filed multiple grievances and letters discussing her alleged discrimination and retaliation.  In August of 2017, Plaintiff filed grievances with the New York State Department of Labor and the New York State Correctional Officers & Benevolent Association, Inc.  (*Id.* ¶¶ 89–90).   In September of 2017, Plaintiff submitted a letter to the Director of Diversity Management discussing the incident with her hijab and her denial to return.  (*Id.* ¶ 91.)  She then filed a grievance against the Diversity Management Office, as her August 14 and August 23 grievances were ignored.  (*Id.* ¶ 92.)  In September, Plaintiff also submitted a letter to Human Resources detailing the surrounding events around the September 2017 medical examination by Dr. Kurtz.  (*Id.* ¶ 93.)

On or about December 7, 2017, Plaintiff was permitted to return to work.  (*Id.* ¶ 94.) Plaintiff received a bid to work with the DOCCS staff at Mt. Vernon hospital, but she was required to report to Defendants Murphy and Artuz, and Defendant Curra remained responsible for overseeing Plaintiff's attendance.  (*Id.* ¶ 95.)  Since returning to work, Defendant Curra has marked Plaintiff as absent without leave ("AWOL") on days that Plaintiff reported to her post as well as on days where Plaintiff had prearranged medical appointments and submitted all required

paperwork. (*Id*. ¶ 96.)  As a result, Plaintiff has been charged for overpayment for time she worked and has received a notice of discipline. (*Id*. ¶ 97.)  In or around January 2020, DOCCS directed Defendant Curra to remove nine AWOLs from Plaintiff's attendance records after determining that they were inaccurate. (*Id*. ¶ 98.)  Plaintiff wrote to Defendant Curra's superiors in February and March 2020 informing them of Defendant Curra's conduct and requesting another Lieutenant to oversee her time and attendance. (*Id*. ¶ 99.).  However, Plaintiff has not received any response. (*Id*.)

Before beginning her bid at Mt. Vernon, Plaintiff was informed by another officer that Officer Pettigrew, who socializes with Defendants Artuz and Curra, told other Mt. Vernon officers that Plaintiff was considered "bad news" and that anyone associating with Plaintiff would find themselves in trouble with the administration. (*Id*. ¶¶ 101–02.)  After Plaintiff began working at Mt. Vernon, Officer Pettigrew filed a grievance claiming that the Plaintiff assaulted her. (*Id*. ¶ 104.)  While the grievance was determined to be unfounded, Plaintiff was required to sign a cease and desist, and Officer Pettigrew was not disciplined for filing that grievance. (*Id*.)  Officer Pettigrew also appeared at Plaintiff's duty post with her sidearm on a day that Officer Pettigrew was not scheduled to work. (*Id*.)  Plaintiff had submitted at least four internal memoranda to her superiors regarding harassment by Officer Pettigrew, which have gone without a response. (*Id*. ¶ 105.)

In this action, Plaintiff requests a total of $8 million in damages, plus punitive damages, costs, and attorney's fees, and an injunction requiring Defendants (1) "to correct all present and past violations of federal and state law," (2) "require Defendants to appoint a disinterested Lieutenant to oversee Plaintiff's time and attendance," and (3) "to require Defendants to respond in good faith to Plaintiff's grievances of workplace harassment by her coworkers." (*Id*. at 33.)

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[1]

**DISCUSSION**

**I.    Title VII**

Plaintiff alleges religious discrimination and retaliation against DOCCS[2] under Title VII. (Second Am. Compl. ¶¶ 109–26.) The Court evaluates each claim separately below.

**A.  Religious Discrimination**

---

[1] In her opposition, Plaintiff incorrectly argues that the *Twombly* plausibility standard is not applicable to discrimination cases. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp." (ECF No. 48) at 4.) As Defendants note, Plaintiff relies on case law that has been overturned by *Ashcroft v. Iqbal*. (Defendants' Memorandum of Law in Support Of Their Motion to Dismiss The Second Amended Complaint ("Defs.' Br.") (ECF No. 47) at 2) (citing *Iqbal*, 556 U.S. at 686–87).

[2] In her Opposition, Plaintiff concedes that her Title VII claim is only against DOCCS and not against the State of New York. (Pl.'s Opp. at 8.)

Title VII provides that an employer cannot discriminate against "any individual" based on his or her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To survive a motion to dismiss, a claimant must plausibly allege two elements: "(1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin."  *Lowman v. NVI LLC*, 821 Fed. Appx. 29, 30 (2d Cir. 2020) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)).

An employer discriminates against an employee "by taking an adverse employment action against him."  *Vega*, 801 F.3d at 85.  An adverse employment action is a "materially adverse change in the terms and conditions of employment."  *Id.* (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  The Second Circuit has indicated that such an action "is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  There are no "bright-line rules" for determining whether an employee has suffered an adverse employment action, but an adverse employment action "generally includes termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . ." *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016).

Relatedly, an adverse action is defined in part by the causal role the claimant's protected identity played in the change.  Thus, the change in terms and conditions must be "because of" the employee's race, color, religion, sex or national origin, and the claimant's protected identity must be "a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989) (plurality opinion), *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat.

1071).  At this stage, an employee must allege the adverse action was made "at least in part for a discriminatory reason" and this may be done by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  *Id.* at 87 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)).

### a.   Adverse Employment Action

In her opposition, Plaintiff alleges two potential adverse employment actions as part of her Title VII discrimination claim: (1) denial of her request to take off her hijab in front of a female supervisor; and (2) being dismissed from work, taken off the payroll, and prevented from returning for an extended period of time.

Plaintiff alleges that she suffered an adverse employment action by being denied a female supervisor for her hijab "demonstration" (*i.e.* a demonstration that she could quickly remove her hijab without being choked).[3]  (Second Am. Compl. ¶¶ 45–47, 113; Pl.'s Opp. at 10–11.)  Plaintiff argues that Defendants' requiring of her to undertake the hijab demonstration before Defendant Artuz and forcing her to unveil herself before a non-familial male, in violation of her religious beliefs, should be considered an adverse employment action.  (Pl.'s Opp. 10–11.)  She adds that she was forced to comply under threat of discipline based on comments made by Defendant Artuz, such as "You can like it or take it off" and "You have to deal with the consequences."  (Pl.'s Opp. 13; Second Am. Compl. ¶¶ 39, 43, 44).

Denial of an accommodation may be considered an adverse action.  *Little v. NBC*, 210 F. Supp. 2d 330, 337 (S.D.N.Y. 2002) ("While there is no exhaustive list of what constitutes an

---

[3] Plaintiff also alleges that she was not offered a private area to remove her hijab upon request, as provided in the Diversity Management Office email accompanying the letter outlining the terms of her religious accommodation.  (Second Am. Compl. ¶¶ 23, 47.)  But as Defendants point out, removing the hijab in public would not have allowed Plaintiff to demonstrate that it could immediately be torn away should anyone try to grab it, as required under the accommodation letter (*Id.* ¶ 22; Defs.' Br. at 10–11.)  Plaintiff does not allege any objections to the accommodation letter, which was sent to her. (Second Am. Compl. ¶ 22.)

adverse employment action, courts have held that the following actions, among others, may qualify: . . . denial of a requested employment accommodation[.]").  However, a claimant must still allege a material adverse event as a result of the denial of the accommodation.  *See Reyes v. New York State Office of Children and Family Services*, No. 00 Civ. 7693(SHS), 2003 WL 21709407, at *7 (S.D.N.Y. July 22, 2003) ("[T]he sole adverse action that Reyes alleged . . . with respect to national origin discrimination is [the defendant's] denial of his request for religious accommodation.  As Reyes suffered no material consequences from that denial, it cannot constitute an adverse employment action.").  Plaintiff's Second Amended Complaint fails to allege any material adverse change to her employment in connection with her request to have a female supervisor conduct her hijab demonstration, particularly as Plaintiff complied with Defendant Artuz's instructions and the conditions for her to wear her hijab were deemed satisfied.

Plaintiff insists, however, that the severe distress she experienced after she removed her hijab in front of Defendant Artuz, in violation of her religious beliefs, should itself be considered a material adverse event.  Pl.'s Opp. at 16.  However, Plaintiff cites to no supporting caselaw for that proposition, and other cases indicate that "a plaintiff's purely subjective feelings about the events and circumstances" regarding an event is insufficient to constitute an adverse employment action.  *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 84 (E.D.N.Y. 2002); *see also Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997) (supervisor's conduct, which left employee feeling "frightened" and "humiliated" failed to show employee suffered an adverse employment action); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("being yelled at, receiving unfair criticism . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of Plaintiff's employment") (internal citation and quotation omitted) (modification in original).

Plaintiff also alleges in her Second Amended Complaint that DOCCS discriminated against her by dismissing her from work, taking her off the payroll, and not allowing her back for months. "[C]ourts have found unpaid leave to be an adverse employment action in the context of [] Title VII [] claims." *Jamil v. Sessions*, 14-CV-2355 (PKC) (RLM), 2017 WL 913601, at *8 (E.D.N.Y. Mar. 6, 2017); *see also Hughes v. City of Rochester*, 12-CV-6112, 2016 WL 4742321, at *6 (W.D.N.Y. Sept. 12, 2016) (stating, in a Title VII discrimination case, that "at a minimum, the adverse employment actions [] include: [the employer's] decision to place plaintiff on unpaid leave"). Plaintiff alleges she was dismissed from her place of work with no pay for about seven months, which clearly constitutes a material change in her employment. Thus, the Court finds that Plaintiff's dismissal and removal from the payroll for about seven months constitutes an adverse employment action.

### b. *Inference of Discrimination*

Even if Plaintiff successfully plead adverse employment actions, her amended claim fails to plead any facts showing a plausible inference of discrimination. Like in her Amended Complaint, Plaintiff does not allege in her Second Amended Complaint that any comments were made about her hijab, that she was asked to not wear it at work, or anything else that would suggest that the alleged discrimination she faced was related to her adherence to Islam. *See Glascoe v. Soloman*, 18 Civ. 8284, 2020 WL 1272120, at *7 (S.D.N.Y. Mar. 17, 2020).

Plaintiff argues that the temporal proximity between the relevant events gives rise to an inference of discrimination. The timing and sequence of events may adequately establish an inference of discrimination at the motion to dismiss stage. *See Govori v. Goat Fifty, L.L.C.*, 519 Fed. Appx. 732, 734 (2d Cir. 2013) (holding temporal proximity between events may give rise to a *prima facie* case of discrimination). However, the timing of events here is insufficient to give

rise to an inference of discrimination, particularly as Plaintiff concedes in the Second Amended Complaint there were "no overtly discriminatory comments made within Plaintiff's hearing." (Second Am. Compl. ¶ 122.)  *See, c.f., Babsky v. DeLeo*, 1:16-cv-08576, 2017 U.S. Dist. LEXIS 45883, at *12 (S.D.N.Y. Mar. 27, 2017) ("The timing and sequence of events—that is, Plaintiff's refusal to work during his religious observances, [Defendant's] allegedly derogatory remark about Plaintiff's religion during a conversation about reasonable accommodations, and Plaintiff's discharge days later—is sufficient at this early stage in the litigation to plausibly support an inference of religious discrimination.").  While Plaintiff was dismissed shortly after attending her meeting with Defendant Artuz regarding her hijab, there is no allegation that this meeting motivated her dismissal in any way.  Instead, Plaintiff alleges that she had already complied with the conditions DOCCS put in place before she could wear her hijab and that DOCCS recognized that she had complied with these conditions.  Accordingly, Plaintiff fails to allege any discriminatory reason for DOCCS to prevent her from working after she had already confirmed with a supervisor that her hijab conformed to the requirements mandated for her to safely wear a hijab as a Corrections Officer.

Plaintiff's own pleadings concede that she was dismissed for non-discriminatory reasons. Plaintiff states that she was sent to the medical clinic and subsequently sent home due to falling twice.  (Second Am. Compl. ¶¶ 56–57.)  Plaintiff offers no facts showing that she was being rejected from returning to work in connection with her religion or her religious accommodation. Instead, the facts alleged show that Plaintiff was not allowed to return her work because Defendant Curra perceived errors in her necessary paperwork—and Plaintiff does set forth sufficient facts that Defendant Curra rejected Plaintiff's paperwork on the basis of her religion, much less that she was aware of Plaintiff's religious accommodation.  Therefore, Plaintiff has not made a plausible

showing that her membership in a faith community was a motivating factor of any adverse employment action.

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's Title VII discrimination claim and dismisses the claim with prejudice.

### B. Retaliation

Plaintiff alleges that DOCCS retaliated against her in violation of Title VII by forcing her to leave work, taking her off the payroll, and refusing her permission to return for several months, all after she requested her religious accommodation.  (Second Am. Compl. ¶¶ 122–23.)  Plaintiff also now asserts in the Second Amended Complaint that after she returned to work, Defendant Curra repeatedly and incorrectly marked her as AWOL on days she presented herself to work.  (*Id.* ¶ 96.)

To state a claim for retaliation under Title VII, a claimant must plead facts that show that (1) he or she "participated in a protected activity known to the defendant;" (2) "the defendant took an employment action disadvantaging" him or her; and (3) there was a "connection between the protected activity and adverse action."  *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (citing *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004)).  For a retaliation claim to survive a motion to dismiss, the plaintiff must plausibly allege that: "(1) defendants discriminated or took an adverse employment action against him [or her], (2) because he [or she] has opposed any unlawful employment practice."  *Vega*, 801 F.3d at 90 (internal quotations omitted).

In the Title VII retaliation context, an "adverse employment action" is read more broadly than in the Title VII discrimination context.  *Id.*  Thus, an adverse employment action sufficient to support a retaliation claim is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington Northern & Santa Fe*

*Ry. v. White*, 548 U.S. 53, 57 (2006)).  To show causation between the adverse action and the protected activity, a claimant must plausibly plead a connection between the two events.  *Id*. Similar to discrimination claims, this may be done using temporal proximity.  *Id*. (citing *Cifra v. Gen. Elec. Co*., 252 F.3d 205, 217 (2d Cir. 2001)).  Additionally, a plaintiff bringing a Title VII retaliation claim, "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action."  *Id*.  But-for causation requires a showing that "the adverse action would not have occurred in the absence of the retaliatory motive."  *Id*. at 91 (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

Plaintiff satisfies the first element as requesting a religious accommodation constitutes protected activity.  *Privler v. CSX Transp., Inc*., 1:18-cv-1020 (BKS/CFH), 2021 WL 3603334, at *19–20 (N.D.N.Y. Aug. 13, 2021).  Additionally, as discussed above, being placed on unpaid leave is an adverse employment action.  *Jamil*, 2017 WL 913601, at *8.  Plaintiff alleges she was dismissed from her place of work for about seven months, which clearly constitutes an action that would dissuade an employee from a protected activity.  Thus, the Court finds that Plaintiff's dismissal and removal from the payroll constitutes an adverse employment action, and therefore the second element is met.  Defendant Curra's numerous AWOL markings on Plaintiff's attendance record for days that she actually worked could also constitute an adverse employment action, particularly as Plaintiff pleads she was charged for overpayment and received a notice of discipline.  (Second Am. Compl. ¶ 97.)

Plaintiff, however, must also show a connection between her religious accommodation request and the adverse employment action.  Here, similar to her discrimination claim, Plaintiff relies on the temporal proximity to make this connection.  In the retaliation context, this is sufficient where the temporal proximity is "very close."  *Clark County Sch. Dist. v. Breeden*, 532

14

U.S. 268, 273 (2001); *see also Deravin v. Kerik*, No. 00 CV 7487 (KMW) (KNF), 2007 WL 1029895, at *11 (S.D.N.Y. Apr. 2, 2007) (discussing how time periods greater than one year have been generally rejected to establish a causal connection).

Despite Plaintiff's opportunity to amend her pleadings to correct deficiencies identified in the prior complaint, Plaintiff's Second Amended Complaint continues to fail on this third element. Plaintiff continues to allege that she requested her accommodation on October 14, 2016, her accommodation was approved on or around April 16, 2017, and she was dismissed on May 2, 2017.  (Second Am. Compl. ¶¶ 19, 22, 57.)  She also now argues that Defendant Curra took further retaliatory measures after May 2, 2017 by classifying her injury as mental-health related despite a doctor's note to the contrary, by pretextually rejecting Plaintiff's medical documentation and striking her from the payroll, and by purportedly attempt to sabotage Plaintiff's DOCCS medical examination.  Pl.'s Opp. at 18.  However, the length of time between Plaintiff's request for accommodation and these purported retaliatory actions is too long to presume a connection between her accommodation request and her dismissal.  *See Wojcik v. Brandiss*, 973 F.Supp.2d 195, 216 (E.D.N.Y. 2013) (holding a time period of nearly six months between the employee's complaints about his supervisor and the incident that led to his termination was too long of a time period to support his retaliation claim); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("Second Circuit courts have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation.") (internal quotations omitted).  In addition, Plaintiff fails to allege that Defendant Curra was aware of Plaintiff's request for a religious accommodation. Therefore, Plaintiff's allegations fail to adequately show the connection between Curra's purported retaliatory actions and Plaintiff's request for religious accommodation.

Plaintiff also argues that Defendants Murphy and Artuz retaliated against her by requiring her to remove her hijab in front of Defendant Artuz even though there were female supervisors available to conduct the hijab demonstration.  Pl.'s Opp. at 17–18.   However, beyond Plaintiff's conclusory statements that it is "inconceivable" that such actions had "any valid, non-discriminatory motivation," Plaintiff offers no well-pled factual allegations that Defendants had any motive to retaliate against Plaintiff for making her religious accommodation request.  Plaintiff's argument is also undermined by her own allegations that the Defendants were following the accommodation guidelines provided to them.  As Plaintiff alleges, the Diversity Management Office letter granting her accommodation required that the hijab be inspected by Defendant Murphy to confirm that it met the guidelines, and his subordinate, Defendant Artuz, showed Plaintiff the conditions of the accommodation and conducted the hijab demonstration after receiving instruction from Defendant Murphy.  (Second Am. Compl. ¶¶ 22, 33–36, 43–46.)[4]  *See Iqbal*, 556 U.S. at 682 ("As between that 'obvious alternative explanation' . . .and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion") (citation omitted); *Powell v. Merrick Acad. Charter Sch.*, No. 16-CV-5315-NGG-RLM, 2018 WL 1135551, at \*7 (E.D.N.Y. Feb. 28, 2018) (obvious alternative explanation for plaintiff's termination rendered inferences of discrimination unreasonable).

---

[4] Plaintiff contests Defendants' attachment of the Diversity Management Office accommodation letter to their opening brief and argues that such letter was improperly attached at the pre-discovery stage of litigation and is presented without "vital context, most notable of which is the [Diversity Management Office] guidance for implementing the accommodation." (Pl.'s Opp. at 5.)  The Court agrees with Defendants that the accommodation letter is incorporated by reference given numerous references to it in the Second Amended Complaint and Plaintiff's summarizing of the content of that accommodation letter.  *See Cent. States, Se. & Sw. Area Health, & Welfare Fund v. Gerber Life Ins. Co.*, 984 F. Supp. 2d 246, 249 (S.D.N.Y. 2013), ("On a motion to dismiss, the court may consider . . . any documents incorporated in the complaint by reference.") (internal citation omitted), *aff'd sub nom. Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150 (2d Cir. 2014); *Tubbs v. Stony Brook Univ.*, No. 15 CIV. 0517 (NSR), 2016 WL 8650463, at \*4 (S.D.N.Y. Mar. 4, 2016) ("a document may be incorporated when a plaintiff had possession or knowledge of the document, upon which they relied in drafting the complaint").  In any event, Plaintiff's allegations regarding the additional guidance that accompanied the accommodation letter are taken as true for purposes of this motion.  (Second Am. Compl. ¶ 23.)

With respect to the grievances and letters Plaintiff filed in August and September of 2017 regarding her "discriminatory and retaliatory treatment," Plaintiff's allegations in the Second Amended Complaint remain insufficient in pleading retaliatory conduct under Title VII.   (Second Am. Compl. ¶¶ 89–93.).  Most of the alleged retaliatory action occurred before Plaintiff submitted her first grievance on August 14, 2017.   Plaintiff was sent home on May 2, 2017, taken off the payroll as of May 27, 2017, and was informed on August 4, 2017 that she had been overpaid in Workman's Compensation.   (Second Am. Compl. ¶¶ 57, 71–73.)   *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 328 (E.D.N.Y. 2014) (no indication of retaliatory conduct when grievances email was sent after plaintiff's ability to use of compensatory time to attend religious prayers was terminated).

Post-September 2017, Plaintiff attempts to show temporal relation between her grievance filings and Defendant Curra's incorrect AWOL markings on Plaintiff's attendance records.  Pl.'s Opp. at 19.   Plaintiff fails, however, to allege whether Defendant Curra even knew of the grievances that were filed, or when such AWOLs were incorrectly marked. *See Glascoe,* 2020 WL 1272120, at *9 (no inference of retaliation where Plaintiff failed to set forth sufficient facts showing that Defendant was aware of Plaintiff's complaint to the Department of Education at the time that Defendant disciplined Plaintiff).  Plaintiff therefore continues to fail to allege the causal connection between her adverse employment action and her grievances.[5] [6]

---

[5] It is unclear whether Plaintiff also argues that she experienced a hostile work environment.  Regardless, a hostile work environment claim would fail because, as discussed, Plaintiff does not allege sufficient facts showing that she experienced any adverse employment action because of her religion.  *See Adams-Flores v. City of New York*, No. 18-CV-12150 (JMF), 2021 WL 918041, *4 n. 1 (E.D.N.Y. Mar. 10, 2021) (hostile work environment claim failed because plaintiff "fails to allege sufficient facts showing that any actions taken against her were taken because of a protected characteristic").

[6] In addition, Plaintiff's Second Amended Complaint describes that after she began working at Mt. Vernon, a Corrections Officer named Angel Pettigrew, who socializes with Defendants Murphy and Artuz, bullied Plaintiff and filed an assault grievance against her that was later dismissed because it was deemed unfounded.  (Second Am. Compl. ¶¶ 100–05.)  Plaintiff also alleges that Pettigrew told other colleagues that Plaintiff was considered "bad news"

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's Title VII retaliation claim, and dismisses the claim with prejudice.

## II.        Section 1983

Plaintiff next alleges Defendants Murphy, Artuz, and Curra engaged in religious discrimination and retaliation, in violation of her First and Fourteenth Amendment rights. (Second Am. Compl. ¶¶ 127–39.)

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

Constitutional claims alleging religious discrimination or retaliation brought under section 1983 are evaluated under the same standard as Title VII claims. *See, e.g., Lewis v. City of Norwalk*, 562 Fed. Appx. 25, 29 (2d Cir. 2014) (analyzing Title VII and § 1983 retaliation claims under the

---

and that anyone associating with Plaintiff would find themselves in trouble with the administration. (*Id.* ¶ 102.) In her opposition, Plaintiff does not argue how these alleged facts around Pettigrew support any of her discrimination and retaliation claims, and in any event, Plaintiff fails to offer sufficient facts that Pettigrew's conduct was related to any discriminatory motive.

same framework); *Melendez v. Cnty. of Westchester*, No. 17-CV-9637 (NSR), 2019 WL 251731, at *10 (S.D.N.Y. Jan. 16, 2019), ("the requirements under 1983 are the same as those required to establish a prima facie employment discrimination claim under Title VII"), *on reconsideration*, No. 17-CV-9637 (NSR), 2019 WL 297519 (S.D.N.Y. Jan. 23, 2019); *Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *14 (S.D.N.Y. July 15, 2015) ("As noted, Feliciano also brings claims under both §§ 1981 and 1983.  Claims of discrimination, retaliation, and hostile work environment under these statutes match those under Title VII.").   Here, Plaintiff alleges the three individual Defendants discriminated and retaliated against her because of her religion.  However, for the same reasons that her Title VII claim fails against DOCCS, Plaintiff has also failed to sufficiently plead Section 1983 claims against the individual Defendants.  Specifically, Plaintiff fails to adequately allege that any purported adverse employment action was on the basis of her religion.[7]

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's Section 1983 discrimination and retaliation claims and dismisses the claims with prejudice.

### III.   ADA

Plaintiff next alleges DOCCS and the individual Defendants discriminated against her as an employee with a disability by forcing her to leave work and refusing medical notes approving her return.  Plaintiff further alleges in her Second Amended Complaint that Defendant Curra's denial of Plaintiff's unemployment benefits as well as her numerous incorrect AWOL markings on Plaintiffs' attendance record show discrimination in violation of Title I of the ADA.  (Second Am. Compl. ¶¶ 140–53.)

---

[7] Defendants also argue that each of the individual Defendants have qualified immunity. (Defs.' Br. at 19.) Because the Court dismisses Plaintiff's Section 1983 claim on the grounds discussed, the Court will not reach the parties' qualified immunity arguments.

Title I of the ADA forbids employment discrimination against persons with disabilities. *See Tennessee v. Lane,* 541 U.S. 509, 516 (2004). In order to establish a *prima facie* case under Title I of the ADA, a claimant must sufficiently allege: "(1) that his [or her] employer is subject to the ADA; (2) that he [or she] was disabled within the meaning of the ADA; (3) that he [or she] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) that he [or she] suffered an adverse employment action due to his disability." *Klaes v. Jamestown Bd. of Public Utilities*, No. 11-CV-606, 2013 WL 1337188, at *7 (W.D.N.Y. Mar. 29, 2013) (citing *Cameron v. Communit. Aid for Retarded Children, Inc*., 335 F.3d 60, 63 (2d. Cir. 2003)). When analyzing a motion to dismiss, the Court will consider the elements of the *prima facie* case "in determining whether there is sufficient factual matter in the complaint" which "gives defendant a fair notice of plaintiff's claim, and the grounds on which it rests." *Id*. (citing *Murphy v. Suffolk County Community College*, No. 10-CV-0251 (LDW)(AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011)).

As an initial matter, Plaintiff concedes that her ADA claim is not brought against the State of New York. (Pl.'s Opp. at 21.) Plaintiff instead seeks to recover $2 million in damages from DOCCS as well as from the individual Defendants. (Second Am. Compl ¶¶ 141, 153.) However, the Eleventh Amendment bars Plaintiff from seeking relief from DOCCS, a New York state agency, under Title I of the ADA. *See Quadir v. New York State Dep't of Lab*., 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014) ("Because Congress has never abrogated New York's sovereign immunity from claims under Title[] I . . . of the ADA and New York has never waived it, all of [plaintiff's] ADA claims are barred by the Eleventh Amendment."); *Melrose v. New York State Dep't of Health Off. of Pro. Med. Conduct*, No. 05 CIV. 8778SCRLMS, 2009 WL 211029, at *5 (S.D.N.Y. Jan. 26, 2009) ("Eleventh Amendment immunity applies [to Title I of the ADA]

regardless of the nature of the relief sought, absent abrogation or waiver . . .").  Plaintiff may also

not seek individual liability under Title I of the ADA against any of the individual Defendants.

*Fox v. State Univ. of New York*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) (citing *Garcia v.

S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir.2001).  Plaintiff therefore can

only seek injunctive relief under Title I of the ADA against the individual Defendants in their

official capacities, which Plaintiff does not appear to request in her Second Amended Complaint.

*Palmer v. New York State Off. of Ct. Admin*., 526 F. App'x 97, 99 (2d Cir. 2013) (stating that

plaintiff was required to name a state official acting in his official capacity as a defendant in order

to avail herself of the exception to Eleventh Amendment immunity).  Therefore, Plaintiff's ADA

claim fails.

Putting aside the Eleventh Amendment bar to the remedy that Plaintiff seeks, Plaintiff's

ADA claim also fails on the pleadings.

Defendants concede that Plaintiff has alleged a "disability" for purposes of this motion.[8]

*See* Defs.' Br. at 21; Defendants' Reply Memorandum (ECF No. 49) at 8.   Here Plaintiff alleges

two disabilities—her actual diabetes and the perceived mental illness with which Defendant Curra

diagnosed her.  (Second Am. Compl. ¶ 143; Pl.'s Opp. at 22.).  The parties mainly disagree whether

Plaintiff sufficiently alleged that she suffered adverse action or retaliation *because* of her disability.

Plaintiff argues that Defendant Curra's "months-long reign of terror over Plaintiff's finances and

ability to return to work," which was purportedly at the direction of Defendants Murphy and Artuz,

"was only possible because of Plaintiff's perceived mental health status."   (Pl.'s Opp. at 23.)

Plaintiff also points to the "close temporal proximity" between when Plaintiff was perceived to

---

[8] Per the ADA, the term "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).

have a mental illness and when Defendant Curra refused Plaintiff's permission to return to work, denied her employment benefits, and marked her as AWOL. (*Id.*)

Plaintiff's amended pleadings still fail to adequately allege that Plaintiff suffered adverse action or retaliation because of her real or perceived disability. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("[t]he ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action."). Plaintiff's allegations neither show an inference of discrimination through overt discriminatory conduct nor any disparate treatment. *See Murtha v. New York State Gaming Comm'n*, No. 17 CIV. 10040 (NSR), 2019 WL 4450687, at *11 (S.D.N.Y. Sept. 17, 2019) ("plaintiff alleging disability discrimination under the ADA pursuant to a theory that his employer took adverse employment action against him due to his disability may demonstrate circumstances giving rise to an inference of discrimination through evidence of overt discriminatory conduct or disparate treatment."). Rather, Plaintiff's argument that Defendant Curra discriminated against her by rejecting her medical notes approving her return to work is bellied by Plaintiff's allegations that the rejections were based on mistakes Plaintiff made to the required documents, and no further facts are alleged that Defendant Curra rejected the documents on the basis of Plaintiff's disability. *Id.* ¶¶ 66–67. Nor does Plaintiff offer any factual allegations, beyond conclusory statements, indicating that Defendant Curra's denying of Plaintiff's unemployment benefit or AWOL markings were on the basis of her disability. (*Id.* ¶¶ 78–79, 96.). *See Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) ("a mere subjective belief that he was discriminated against ... does not sustain a ... discrimination claim") (internal quotations and citations omitted). While Defendant Curra's determination that Plaintiff had a mental illness, which was contrary to a doctor's notes, caused Plaintiff to pay back $1,000 in Workman's Compensation, Plaintiff does

not allege sufficient facts indicating that Defendant made such determination with discriminatory intent. *See, e.g., Brown v. New York City Dep't of Educ.*, 513 F. App'x 89, 91 (2d Cir. 2013) (no indication that incorrect employment categorization "was a pretext for discrimination rather than simply a good faith mistake").

In addition, with respect to Plaintiff's retaliation claim under the ADA, this claim fails for the same reasons that Plaintiff's Title VII retaliation claim fails. *See supra*, Section I.B. Title I of the ADA prohibits retaliation against any individual who has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under the ADA." 42 U.S.C. §12203(a). "The Second Circuit has concluded that it is appropriate to apply the framework used in analyzing retaliation claims under Title VII when analyzing a claim of retaliation under the ADA." *Klaes,* 2013 WL 1337188, at *9. Because Plaintiff fails to allege retaliation under Title VII, Plaintiff's retaliation under the ADA also fails.

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's ADA claim, and dismisses the claim with prejudice.

## IV.     N.Y. Executive Law § 296

Plaintiff also raises religious and disability-based discrimination and retaliation claims under New York State Human Rights Law Executive Law § 296 against DOCCS.[9] (Second Am. Compl. ¶¶ 154–65.) However, the Eleventh Amendment bars Plaintiff from raising this claim, as "New York has not waived its Eleventh Amendment immunity" under the New York State Human Rights statute. *See Schiavone v. New York State Off. of Rent Admin.*, No. 18-CV-130 (NSR), 2018

---

[9] In her Opposition, Plaintiff concedes that her state law claim is only against DOCCS and consents to dismissal of this claim against the individual Defendants. (Pl.'s Opp. at 25.)

WL 5777029, at *4 (S.D.N.Y. Nov. 2, 2018) (dismissing Plaintiff's New York State Human Rights

Law Executive Law claim against New York state agency as barred by the Eleventh Amendment).

In any event, the pleading standards for discrimination and retaliation claims raised under

New York State Law mirror the pleading requirements under Title VII and the ADA, and therefore

the viability of Plaintiff's state law claims is the same as that for her federal claims. *Song v. Ives*

*Laboratories, Inc*., 957 F.2d 1041, 1048 (2d Cir. 1992); *Trane v. Northrop Grumman Corp*., 94 F.

Supp. 3d 367, 376 (E.D.N.Y. 2015). Given the Court's dismissal of Plaintiff's Title VII, Section

1983, and ADA claims, the same result is appropriate for Plaintiff's state law claim.

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's state law

claim, and dismisses the claim with prejudice.

## V. Injunctive Relief

In addition to monetary damages, Plaintiff also seeks injunctive relief requiring Defendants

(1) "to correct all present and past violations of federal and state law," (2) "to require Defendants

to appoint a disinterested Lieutenant to oversee Plaintiff's time and attendance," and (3) "to require

Defendants to respond in good faith to Plaintiff's grievances of workplace harassment by her

coworkers." (Second Am. Compl. at 33.)

Defendants make several arguments articulating why Plaintiff's request for injunctive

relief fails, none of which Plaintiff addresses. (Defs.' Br." at 24–25.) It is well-settled that the

failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument

and abandonment of the claims. *Wilkov v. Ameriprise Fin. Servs., Inc*., 753 F. App'x 44 (2d Cir.

2018) ("We affirm the District Court's dismissal of those claims on the ground that they were

'abandoned' by Wilkov when she failed to oppose them in her opposition to Ameriprise's motion

to dismiss."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313 (S.D.N.Y. 2018)

("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim."); *Johnson v. City of New York*, 15-CV-8195, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017) (holding that the plaintiff abandoned her claim because her opposition did not address the defendants' arguments, including their argument that they lacked personal involvement); *Barmore v. Aidala*, 419 F.Supp.2d 193, 201 (N.D.N.Y. 2005) (dismissing the plaintiff's claims against the defendants because the plaintiff did not address the defendants' personal involvement arguments in its opposition to the defendants' motion to dismiss). Therefore, the Court deems that Plaintiff has abandoned its request for injunctive relief.

Even if the Court considers Plaintiff's request for injunctive relief, such request would nonetheless be denied.

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). For the Court to have subject matter jurisdiction, the plaintiff must allege he or she has standing to seek injunctive relief. "In order to meet the constitutional minimum of standing to seek injunctive relief, [plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)). In making this showing, an "abstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id*. (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)) (internal quotations omitted).

Further, "an injunction must be more specific than a simple command that the defendant obey the law." *S.C. Johnson & Son, Inc. v. Clorox Co*., 241 F.3d 232, 240 (2d Cir. 2001) (internal quotations omitted). "Obey the law" injunctions are "vague, do not require the defendants to do

anything more than that already imposed by law, subject the defendants to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement" and are therefore "not favored." *Dolberry v. Jakob*, 9:11-CV-1018 (DNH/DEP), 2017 WL 2126812, at *4 (N.D.N.Y. May 16, 2017).

Like in the Amended Complaint, Plaintiff continues to make vague "obey the law" requests in the Second Amended Complaint by asking the Court to require Defendants "to correct all present and past violations of federal and state law." (Second Am. Compl. at 33).  Moreover, Plaintiff's request "to require Defendants to appoint a disinterested Lieutenant to oversee Plaintiff's time and attendance" does not warrant injunctive relief, given that Plaintiff herself alleges that DOCCS reversed Defendant Curra's AWOL determinations around January 2020 (Second Am. Compl. ¶ 98) and Plaintiff does not offer anything other than conclusory statements regarding ongoing misconduct by Defendant Curra.  Lastly, Plaintiff's request for the Court to require Defendants to respond in good faith to the grievances she made to the Diversity Management Office and Human Resources office in 2017 does not confer standing for injunctive relief, particularly as Plaintiff does not allege continual harm from her employer's failure to address those grievances. (Second Am. Compl. ¶¶ 91–93.)

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's request for injunctive relief and dismisses the request with prejudice.  (Pl.'s Opp. at 25.)

## VI.    Leave to Amend

Plaintiff requests permission to amend her pleadings in the event that her claims are deemed to require more specificity.

"The Second Circuit has instructed courts not to dismiss a complaint 'without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a

valid claim might be stated.'" *Howard v. Brown*, No. 15-CV-09930 (ER), 2018 WL 3611986, at *6 (S.D.N.Y. July 26, 2018) (quoting *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013)). However, where "the Court has put Plaintiff on notice of the deficiencies in his original complaint and given him an opportunity to correct these deficiencies in an Amended Complaint, but Plaintiff has failed to do so, dismissal with prejudice is appropriate." *Coon v. Benson*, No. 09-CV-00230 (SCR) (LMS), 2010 WL 769226, at *4 (S.D.N.Y. Mar. 8, 2010). Here, the Court previously detailed the deficiencies in Plaintiff's Amended Complaint and provided Plaintiff leave to amend. However, Plaintiff's Second Amended Complaint fails to address the same deficiencies. Therefore, Plaintiff's claims must be dismissed with prejudice without leave to replead.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss (ECF No 46) and DISMISSES Plaintiff's Second Amended Complaint in its entirety without leave to replead. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 46, to enter judgment accordingly, and to close the case.

Dated: August  19, 2022                                   SO ORDERED:
White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge